# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

MARK D W.[1],

        Plaintiff,

          v.                          CASE NO. 3:21-CV-09-MGG

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## OPINION AND ORDER

Plaintiff Mark D. W. ("Mr. W") seeks judicial review of the Social Security Commissioner's decision denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"). This Court may enter a ruling in this matter based on the parties' consent pursuant to 28 U.S.C. § 636(b)(1)(B) and 42 U.S.C. § 405(g). [DE 12].

For the reasons discussed below, the Court **AFFIRMS** the decision of the Commissioner of the Social Security Administration ("SSA").

## I.    OVERVIEW OF THE CASE

Mr. W filed an application for DIB on February 20, 2018, and an application for SSI on June 7, 2018. Both applications alleged a disability onset date of November 18, 2017. Mr. W's claims were denied initially on October 19, 2018, and upon reconsideration on January 24, 2019. Following a video hearing on December 5, 2019, an

---

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the Court refers to the plaintiff by first name, middle initial, and last initial only.

Administrative Law Judge ("ALJ") issued a decision on February 10, 2020, which affirmed SSA's denial of benefits. The ALJ's decision became the final decision of the SSA Commissioner when the SSA Appeals Council denied Mr. W's request for review on October 30, 2020. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005).

Mr. W sought judicial review on December 31, 2020.[2] Mr. W filed his opening brief on December 3, 2021, and the Commissioner filed her Memorandum in Support of Decision on March 10, 2022. This matter became ripe on March 22, 2022, when Mr. W filed his reply.

## II.    APPLICABLE STANDARDS

### A.    Disability Standard

To qualify for DIB and SSI, a claimant must be "disabled" as defined under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity ["SGA"] by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity is defined as work activity that involves significant physical or mental activities done for pay or profit. 20 C.F.R. § 404.1572.

The Commissioner's five-step sequential inquiry in evaluating claims for DIB and SSI under the Act includes determinations as to: (1) whether the claimant is

---

[2] Mr. W originally filed his complaint in this Court's Fort Wayne Division under cause no. 1:20-cv-494-TLS-SLC. However, Mr. W resides in Kosciusko County, which is located within the geographical boundaries of the South Bend Division. Accordingly, this was case transferred to the South Bend Division and opened under the instant cause number on January 5, 2021.

engaged in SGA; (2) whether the claimant's impairments are severe; (3) whether any of the claimant's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of Part 404; (4) whether the claimant can perform his past relevant work based upon his RFC; and, if not, (5) whether the claimant is capable of performing other work. 20 C.F.R. §§ 404.1520; 416.920[3]. The claimant bears the burden of proof at every step except Step Five, where the burden of proof shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000).

**B.    Standard of Review**

This Court has authority to review a disability decision by the Commissioner pursuant to 42 U.S.C. § 405(g). However, this Court's role in reviewing social security cases is limited. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The question on judicial review is not whether the claimant is disabled; rather, the Court considers whether the ALJ used "the correct legal standards and [whether] the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2007).

The Court must uphold the ALJ's decision so long as it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (citing *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). Substantial evidence is "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence has also been understood as "such relevant evidence as a

---

[3] Regulations governing applications for DIB and SSI are almost identical and are found at 20 C.F.R. § 404 and 20 C.F.R. § 416 respectively. Going forward, this Opinion and Order will only refer to 20 C.F.R. § 404 unless explicit distinction between the DIB and SSI regulations is necessary.

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). The Supreme Court has also noted that "substantial evidence" is a term of art in administrative law, and that "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" in social security appeals. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The Court reviews the entire administrative record to determine whether substantial evidence exists, but it may not reconsider facts, reweigh the evidence, resolve conflicts of evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Accordingly, at a minimum, the ALJ must articulate her analysis of the record to allow the reviewing court to trace the path of her reasoning and to be assured the ALJ has considered the important evidence in the record. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ is not required to address every piece of evidence in the record so long as she provides a glimpse into the reasoning behind her analysis to build the requisite "logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

On the other hand, an ALJ's decision cannot stand if it lacks evidentiary support or inadequately discusses the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "The ALJ must confront the evidence that does not support his conclusion and support why that evidence was rejected." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). As such, an ALJ's decision will lack sufficient evidentiary support and require remand if the ALJ "cherry-picked" the record to support a finding of non-disability. *Denton v.*

*Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see also Wilson v. Colvin*, 48 F. Supp. 3d 1140, 1147 (N.D. Ill. 2014).

## III.   ANALYSIS

### A.   The ALJ's Decision on Mr. W's Applications

Mr. W's video hearing before an ALJ on his applications for DIB and SSI took place on December 5, 2019. On February 10, 2020, ALJ Kathleen Winters issued her written decision finding that Mr. W was not disabled, conducting the requisite five-step analysis for evaluating claims for disability benefits. 20 C.F.R. § 404.1520.

At Step One, an ALJ's inquiry focuses on whether a claimant is engaging in substantial gainful activity. Here, the ALJ determined that Mr. W had not engaged in substantial gainful activity from his alleged onset date of November 18, 2017, through the date of the ALJ's decision.

At Step Two, an ALJ's inquiry focuses on whether a claimant's impairments are severe. For an impairment to be considered severe, an impairment or combination of impairments must significantly limit the claimant's ability to perform basic work-related activities. 20 C.F.R. § 404.1521. Here, the ALJ found that Mr. W suffers from the following severe impairments: status post left knee surgery for torn meniscus; neuropathy left wrist; degenerative disc disease of the cervical spine; and anxiety. Conversely, an impairment is considered non-severe when the medical evidence establishes only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to perform basic work functions. *See, e.g.*, 20 C.F.R. § 404.1522; S.S.R. 85-28, 1985 WL 56856 (Jan. 1, 1985). Here,

the ALJ found that that Mr. W had the following non-severe medically determinable

impairments: osteoarthritis of the right hand, status post ganglion cyst removal;

pancreatitis; a torn meniscus of the right knee; and nonspecific lesions of the brain.

At Step Three, the ALJ found that none of Mr. W's severe impairments, nor any

combination of his impairments, met or medically equaled the severity of one of the

listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In making this finding,

the ALJ considered listings 1.03, 1.04, and 12.06. Accordingly, before moving on to Step

Four, the ALJ proceeded to determine whether Mr. W can perform his past relevant

work based upon his residual functional capacity ("RFC").

A claimant's RFC includes limitations for all medically determinable

impairments, including non-severe impairments. 20 C.F.R. § 404.1545(a)(2). The RFC is

the most that an individual can do despite his limitations. 20 C.F.R. § 404.1545(a). To

determine a claimant's RFC, the ALJ must consider the claimant's symptoms, their

intensity, persistence, and limiting effects, and the consistency of these symptoms with

the objective medical evidence and other evidence in the record. 20 C.F.R. §

404.1545(a)(1). Physical exertion levels in an RFC are classified as either sedentary, light,

medium, heavy, or very heavy. 20 C.F.R. § 404.1567. Here, the ALJ found that Mr. W

had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the

following additional limitations:

> except the claimant can occasionally climb stairs or ramps, can balance
> commensurate with performing the activities outlined herein, can
> occasionally stoop; and can never kneel, crouch, crawl, or climb ladders,
> ropes, or scaffolds. The claimant can frequently reach, handle, finger, or
> feel bilaterally. Work with an option to sit or stand, changing positions no
> more frequently than every 30 minutes, while remaining on task. With
> work that can be learned in 30 days, or less, with simple routine tasks;

routine work place changes; simple work related decisions; he is able to remain on task in two hour increments; and with occasional interaction with coworkers, supervisors, and the general public.

[DE 18 at 31; AR 25]. Based on this RFC, at Step Four, the ALJ found that Mr. W was unable to perform his past relevant work as a machine operator, welder, lathe tender, or cleaner industrial [*Id.* at 35; 29]. Accordingly, the ALJ moved on to the last step in the five-step sequential analysis to determine whether Mr. W could perform other work.

At Step Five, the burden of proof shifts to the Commissioner, who must "provid[e] evidence that demonstrates that other work exists in significant number in the national economy that [the claimant] can do, given [his] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2); *see also Liskovitz v. Astrue*, 559 F.3d 736, 742-43 (7th Cir. 2009). ALJs typically enlist a vocational expert ("VE") to testify regarding which occupations, if any, a claimant can perform. *See* S.S.R. 83-12. VEs use information from the Dictionary of Occupational Titles ("DOT") to inform their assessments of a claimant's ability to perform certain types of work. S.S.R. 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). Here, the VE, using the DOT, identified the following three representative jobs that Mr. W could still perform with his RFC—marker, checker I, and garment sorter, which, respectively, have 53,000 jobs nationally, 6,500 jobs nationally, and 23,000 jobs nationally (82,500 jobs total).

Finding that Mr. W could make an adjustment to other work that existed in significant numbers in the national economy, the ALJ determined that Mr. W was not under a disability as defined in the Act. [DE 18 at 37; AR 31].

B.      Discussion

Mr. W raises six issues in his opening brief. First, as a threshold issue, Mr. W

contends that the ALJ's determination at Step Five is erroneous because the number of

jobs identified—three representative jobs totaling 82,500 jobs nationally—is not a

significant number. As such, Mr. W contends that remand for a direct award of benefits

is appropriate, and that ruling on this issue accordingly obviates the need to address his

subsequent arguments. The Court addresses this argument first.

1.      Whether the ALJ erred at Step Five

Mr. W first contends that the ALJ's decision at Step Five is not supported by

substantial evidence because the number of jobs identified—82,500—does not constitute

a significant number. In support, Mr. W relies on the district court's analysis in *Sally S.*

*v. Berryhill,* No. 2:18CV460, 2019 WL 3335033 (N.D. Ind. July 23, 2019).

In *Sally S.*, an ALJ found that the claimant was not disabled based upon a VE's

testimony that the claimant could still perform 120,350 jobs in the national economy. *Id.*

On judicial review, the claimant challenged the ALJ's decision by contending that the

120,350 jobs identified at Step Five accounted for only 0.080% of the 150,606,000 jobs

existing in the national economy. The Court found that this was not a significant

number of jobs and remanded the case for further administrative proceedings. *See id.*

Here, Mr. W contends that the number of jobs identified in his decision—82,500—is

even less than the 120,350 jobs identified by the VE in *Sally S.* As such, Mr. W contends

that remand for an award of benefits is required.

This argument was addressed in the Seventh Circuit's recent decisions in *Milhem v. Kijakazi*, 52 F.4ᵗʰ 688 (7th Cir. 2022) and *Kuhn v. Kijakazi*, No. 22-1389, 2022 WL 17546947 (7th Cir. Dec. 9, 2022). Like Mr. W, the claimants in *Milhem* and *Kuhn* relied upon *Sally S.* to contend that the number of jobs identified at Step Five in their decisions—89,000—was not significant. However, the court in *Milhem* found reliance on *Sally S.* "misplaced," observing that the Seventh Circuit's "case law does not provide a clear baseline for how many jobs are needed." 52 F.4th at 695-96. *Milhem* further observed that the "only guidepost" was the court's prior decision in *Weatherbee v. Astrue*, which stated that 140,000 jobs nationwide was "well above the threshold for significance." *Id.* at 695 (quoting 649 F.3d 565, 572 (7th Cir. 2011)). Accordingly, *Milhem* declined to rely on the percentage calculation used by the district court in *Sally S.*

Indeed, rather than stating that a certain number of jobs is significant, the court in *Milhem* considered whether the ALJ's decision at Step Five was based upon substantial evidence. *Id.* at 696; *see also Sara B. v. Kijakazi*, No. 1:22-CV-52-JVB, 2023 WL 2013323, at *3 (N.D. Ind. Feb. 15, 2023) ("In short, the Seventh Circuit's recent cases have focused on whether the number of jobs identified is accurate, not whether it is a sufficient number to be "significant."). In *Milhem*, the court found that the ALJ "grounded her conclusion that the number of jobs mentioned was 'significant' on her consideration of [Milhelm's] age, education, work experience, and [RFC] and that [Milhelm] was capable of making a successful adjustment to work that exists in the economy." *Id.* Moreover, *Milhem* found that the ALJ's decision reflected an assessment of "the tolerance of absences in [the identified] positions, the requirements for being on

9

task in the workplace, and the frequency of breaks." *Id.* For these reasons, the court found that "a reasonable person would accept 89,000 jobs in the national economy as being a significant number." *Id.*, *see also Kuhn,* 2022 WL 17546947 at *3 (finding that substantial evidence supported the ALJ's finding that 89,000 was significant based on the same analysis).

Moreover, even though the court in *Milhelm* did not identify a specific number as "significant", the court did observe that the 89,000 jobs identified in the decision was "in accord" with the number of jobs found to be significant in other circuits. *See* 52 F.4th at 697 (citing *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (finding 32,000 jobs nationwide significant); *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (25,000 jobs nationwide); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (10,000 jobs nationwide); and *Weiler v. Apfel*, 179 F.3d 1107, 1110–11 (8th Cir. 1999) (32,000 jobs nationwide)).

Here, the ALJ conducted an analysis akin to the ALJ in *Milhelm*. The ALJ inquired "whether jobs existed in the national economy for an individual with [Mr. W's] age, education, work experience, and [RFC]". [DE 18 at 36]. The VE testified that Mr. W could still "perform the requirements of representative occupations" of Marker, Checker I, and Garment Sorter. [*Id.*]. As part of this consideration, the ALJ also inquired about an inconsistency between the VE's testimony and the DOT. Here, the VE had testified that all identified jobs can be performed either "seated or standing," which is not discussed in the DOT. However, the VE further explained that this information was based upon the VE's professional experience, which the ALJ found reasonable. [*Id.*]. Mr.

W has not otherwise challenged the VE's qualifications or the methodology of the VE's testimony on review.

Likewise, while no threshold for significance has been established, the 82,5000 jobs identified for Mr. W is "in accord" with the numbers deemed significant by the other circuits cited by *Milhem*. 52 F.4th at 697 (discussed above). It is also consistent with numbers deemed significant by other district courts interpreting *Milhem*. *See Sara B.*, 2023 WL 2013323, at *3 (finding that 41,000 jobs identified at Step Five was not an independent ground for reversal while remanding on other grounds); *MARYJANE R., Plaintiff, v. KILOLO KIJAKAZI, Defendant.*, No. 121CV02684SEBMPB, 2023 WL 2118161 (S.D. Ind. Jan. 30, 2023), *report and recommendation adopted sub nom. Russell v. Kijakazi*, No. 121CV02683SEBMPB, 2023 WL 2116401 (S.D. Ind. Feb. 17, 2023) (finding 99,000 jobs to be significant under *Milhem* while recommending reversal on other grounds); *Hoskins v. Kijakaz*i, No. 1:21-CV-469-TLS-SLC, 2022 WL 17665088, at *8 (N.D. Ind. Dec. 14, 2022), *appeal filed*, No. 23-1260 (7th Cir. Feb. 13, 2023) (finding that substantial evidence supported an ALJ's conclusion that 21,500 jobs is significant to be "in accord" with *Milhem*), *Harry v. Kijakazi*, No. 22-CV-0186-BHL, 2022 WL 17584174, at *5 (E.D. Wis. Dec. 12, 2022) (finding that substantial evidence supported an ALJ's conclusion that 29,800 jobs was significant under *Milhem*); *Teresa M. v. Kijakazi*, No. 20 C 859, 2022 WL 17406596, at *8 (N.D. Ill. Nov. 22, 2022) (finding that substantial evidence supported a Step Five finding that 28,000 jobs was significant under *Milhem*).[4]

---

[4] *Cf. James A. v. Saul*, 471 F.Supp.3d 856, 860 (N.D. Ind. 2020) (finding, as a matter of law, 14,500 jobs is not a significant number of jobs); *Kordeck v. Colvin*, No. 2:14-cv-431-JEM, 2016 WL 675814, at *9 (N.D. Ind. Feb.

Without more, this Court cannot find that the number of jobs identified at Step Five—82,500—is insignificant as a matter of law.[5]

### 2.    Whether the ALJ erred in Determining Mr. W's RFC

As Mr. W's first argument does not warrant remand, the Court now considers his remaining five arguments. The rest of Mr. W's opening brief raises various challenges to the ALJ's RFC analysis. When crafting a claimant's RFC, an ALJ must follow a two-step sequential process to determine whether a claimant's symptoms can be accepted as consistent with objective medical evidence and other evidence. First, the ALJ must determine whether there are underlying medically determinable mental or physical impairments that could reasonably be expected to produce the claimant's pain or symptoms. Second, if there are underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms, the ALJ must then evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related

_____

19, 2016) (discussing obsolescence concerns with three jobs identified for the claimant as part of its remand).

[5] In reply, Mr. W also contends that the ALJ's failure to present a significance standard warrants reversal. However, as this argument was raised for the first time on reply, it is typically considered waived. *See Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019); *see also Lesea, Inc. v. Lesea Broad. Corp.*, No. 3:18CV914-PPS/MGG, 2021 WL 3022918, at *3 (N.D. Ind. July 16, 2021) ("Issues raised for the first time in reply are waived, because the opponent has no opportunity to respond.") Yet even considering this argument, it must also be rejected in light of the Seventh Circuit's recent decisions in *Milhem* and *Kuhn*. Notably, the *Milhem* court rejected this same argument, first finding that SSA's regulatory and framework "contains no such requirement." *Id.* at 695. While the regulatory framework provides that "work that exists 'in very limited numbers' cannot be considered 'significant,'" the court observed that ALJs, using substantial evidence, otherwise have discretion to determine what is significant on a case-by-case basis. *Id.* (discussing 20 C.F.R. § 404.1566(b)). Thus, *Milhem* found that the establishment of such a standard "might imply a categorical rule," which has been rejected in the context of the substantial evidence standard in social security hearings. *Id.* (citing *Biestek*, 139 S. Ct. at 1157). Accordingly, the *Milhem* court held that the ALJ's determination was "not depend[ent] upon the establishment of a standard of significance." *Id.*; *see also Kuhn*, 2022 WL 17546947, at *2 ("Under *Milhem*, Kuhn's argument for a significance standard fails.")

activities. *See* 20 C.F.R. § 416.929(a). The ALJ evaluates the intensity, persistence, and limiting effects of symptoms by considering subjective statements regarding symptoms and pain, as well as any description medical sources and other nonmedical sources provide about how these symptoms affect a claimant's ability to work. *See* 20 C.F.R. § 404.1529(a). Relevant factors include:

> (1) The individual's daily activities;
> (2) Location, duration, frequency, and intensity of pain or other symptoms;
> (3) Precipitating and aggravating factors;
> (4) Type, dosage, effectiveness, and side effects of any medication;
> (5) Treatment, other than medication, for relief of pain or other symptoms;
> (6) Other measures taken to relieve pain or other symptoms;
> (7) Other factors concerning functional limitations due to pain or other symptoms

*See id.* § 404.1529(c)(3). This analysis must focus on "the extent to which the symptoms reduce the individual's capacity to perform work-related activities." *Wade v. Berryhill*, No. 2:17-CV-278, 2018 WL 4793133, at *10 (N.D. Ind. Oct. 4, 2018) (citing SSR 16-3p). Moreover, the ALJ must also consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence . . . " 20 C.F.R. § 404.1529(c)(4). Accordingly, a claimant's alleged symptoms are determined to diminish their capacity to work "to extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical and other evidence." 20 C.F.R. § 404.1529(c)(4). So long as the ALJ gives specific reasons supported by the record, the Court will not overturn this determination unless it is "patently wrong." *See Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021).

The ALJ conducted the requisite two-step sequential process here. First, the ALJ found that Mr. W "does have underlying medically determinable impairments that could reasonably cause some symptomatology." [DE 18 at 32; AR 26]. However, the ALJ then found that "a careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by claimant." [*Id.*].  Instead, the ALJ found that Mr. W retained an RFC for light work, with frequent reaching, handling, fingering, and feeling bilaterally, among other limitations. [DE 18 at 31; AR 25].

Mr. W challenges this portion of the ALJ's decision in several ways. First, Mr. W maintains that the ALJ erred by discussing only portions of reports from pain management physician Dr. Austin that support a finding of non-disability while ignoring portions that suggest disability and would credit his testimony. Mr. W then alleges that the ALJ erred by failing to analyze fingering as a non-exertional impairment. Third, Mr. W alleges that the ALJ failed to properly address his shoulder impairment, and as such, his RFC for frequent reaching was erroneous. Following that, Mr. W argues that his RFC broadly fails to include supported limitations regarding reaching, handling, fingering, and feeling. Lastly, Mr. W challenges the ALJ's consideration of his daily activities.

Notably, although Mr. W's opening brief presents these as five arguments, Mr. W raises several points within each. Many points are scattered or perfunctory, lack legal authority, or otherwise fail to explain how cited legal authority applies to the facts of his case. "Judges are not like pigs, hunting for truffles buried in [the record]." *U.S. v.*

*Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (internal citation omitted). Nonetheless, the

Court will carefully consider each of Mr. W's arguments in turn.

> **a. Whether the ALJ Erred in her Consideration of Dr. Austin's Pain Reports**

Mr. W contends that the ALJ erred in her discussion of Mr. W's treatment

records with Dr. Austin, a pain management physician [Exhibit 26F]. The records from

Dr. Austin consist of two visits – one in November 2018 and one in February 2019.

The ALJ broadly cited to Dr. Austin's treatment records three times in the

decision. First, the ALJ referenced these records after noting that Mr. W had reported

chronic neck pain, throbbing, tingling, that he could not sit for thirty minutes, that he

requires rest while walking, and that he had decreased finger sensation.  After

acknowledging Mr. W's reports of his symptoms and limitations, however, the ALJ

explained that "observation with a number of providers showed objective exams

inconsistent with such allegations of limitation." [DE 18 at 33, AR 27]. The ALJ then

cited Dr. Austin's records, as well as to records from Mr. W's hospital stay on

November 3, 2018 (Exhibit B19F) and records from Lutheran Hospital Physicians dated

November 26, 2018, to March 28, 2019 (Exhibit B29F), and observed that these records

showed physical examinations that Mr. W had "normal range of motion, no back pain,

no neck pain, no joint pain, and normal strength." [DE 18 at 33, AR 27].

The ALJ also acknowledged that Mr. W underwent a right extensor tendon

transfer and carpel tunnel release on January 30, 2019. However, citing to Dr. Austin's

records, the ALJ remarked that "objective exams again note the claimant was negative

for joint pain, reduced range of motion, shoulder, hip, and knee maneuvers were negative, he had no atrophy, and strength was intact." [*Id.*] Finally, the ALJ also cited to Dr. Austin's records after discussing that Mr. W reported neck pain that radiated into his arms with tingling. Citing to Dr. Austin's treatment records and to Mr. W's neurology treatment records dated June 5, 2018, to July 23, 2019 [Exhibit B21F], the ALJ stated that "[n]o loss of sensation was consistently observed . . . provocative maneuvers were generally unremarkable. There was a normal gait (although occasionally antalgic), normal muscle stretch and tone, and non-progressive, isolation loss of sensation." [DE 33 at 24, AR 28].

Nonetheless, Mr. W contends that the ALJ failed to acknowledge the overall context and findings of his visits with Dr. Austin. Mr. W explains that, at his first visit in November 2018, Dr. Austin diagnosed him with spinal stenosis of the cervical region and chronic pain syndrome and that Dr. Austin treated him with a C7-T1 Epidural Steroid Injection. [DE 18 at 2461; AR 2455]. Mr. W also contends that the ALJ failed to acknowledge that Dr. Austin documented a brace on his extremity at one visit. Specifically, Mr. W explains that, while Dr. Austin did record a normal gait at his first visit, the treatment records also document an observation that Mr. W was wearing "a brace on his extremity." [DE 26 at 11]. Conversely, Mr. W's second visit in February 2019 documented an antalgic gait but no brace. Mr. W contends that these facts support a finding of a disability but were ignored by the ALJ in the decision.

The ALJ need not discuss every piece of evidence presented; rather, she must provide an accurate and logical bridge between the evidence and her conclusion. Here,

the ALJ cited to physical examination notes from Dr. Austin's records that were not consistent with limitations alleged by Mr. W, and the portions now relied upon by Mr. W fail to demonstrate that the ALJ's analysis was inadequate. First, as to Dr. Austin's findings of spinal stenosis of the cervical region and chronic pain syndrome, mere diagnosis is not sufficient to show disability. *See Melanie W. v. Saul*, No. 1:19-cv-403, 2020 WL 3056309 at *4 (N.D. Ind. June 2, 2020) (citing *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)(stating that the relevant inquiry "is not the existence of these various conditions . . . but their severity and, concretely . . . whether they have caused her such pain that she cannot work full time") and *Johnson v. Colvin*, No. 2:13-cv-138-PRC, 2014 WL 4722529, at *4 (N.D. Ind. Sept. 22, 2014) ("The mere diagnosis of an impairment does not establish that the impairment affects the individual's ability to perform basic work activities.")). Next, while the ALJ did not discuss that Dr. Austin treated Mr. W's neck pain with an injection, this portion of the record also fails to show the need for further limitation.[6] Without more, the Court cannot find that the ALJ's failure to mention Dr. Austin's findings of cervical stenosis and chronic pain syndrome or the steroid injection amounted to the ALJ failing to confront a line of evidence contrary to her opinion, especially as the ALJ discussed physical examination findings from these visits to explain why Mr. W's alleged limitations were not consistent with this evidence. *See Denton*, 596 F.3d at 426; *see also Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

---

[6] Moreover, courts in this circuit have found that "injections [are] on the conservative end of the treatment spectrum." *David C. v. Kijakazi*, No. 20-CV-3891, 2022 WL 602520, at *9 fn. 10 (N.D. Ill. Mar. 1, 2022)(collecting cases).

Next, as to Mr. W's argument that the ALJ did not discuss Dr. Austin's observation of normal gait but with a brace on his extremity, this record does not state that it was a brace on a lower extremity or otherwise correlated to Mr. W's gait. Nor does Mr. W state this in his opening brief. Indeed, as will be addressed further, physical examination notes from Mr. W's second visit with Dr. Austin note a "wrap" on Mr. W's right hand and wrist. [DE 18 at 2445; AR 2439]. Without more, the Court cannot find that this observation of a brace on an undefined extremity supports further limitations or amounts to the ALJ avoiding a line of evidence contrary to her conclusion, especially as the ALJ did otherwise acknowledge that physical examinations, including Dr. Austin's, observed that Mr. W had an "'occasionally antalgic' gait." [DE 18 at 34].

Mr. W also contends that the ALJ's citation to Dr. Austin's record without reference to these details amounted to the ALJ "stepping in the middle of" Dr. Austin's medical judgment and "play[ing] the role of doctor." [DE 26 at 11]. While it is the responsibility of the ALJ to make findings "about what the evidence shows," 20 C.F.R. § 404.1520b, "playing doctor" is "a clear no-no." *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). An ALJ plays doctor where he "substitute[s] his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford*, 227 F.3d at 870. It is not the role of the ALJ to make her own independent medical findings. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

Here, the ALJ did not make any independent medical findings when she referenced Dr. Austin's treatment records. The ALJ did not "play doctor" but instead simply summarized Mr. W's physical examination notes from Dr. Austin. Even if the

ALJ's failure to mention Dr. Austin's cervical stenosis diagnosis or the steroid injection impacted the ALJ's treatment of Dr. Austin's records, the ALJ still provided substantial evidence to explain why Mr. W's alleged limitations were not consistent with objective medical evidence. Based on this, the Court cannot find that the ALJ substituted her judgment for that of Dr. Austin's.

Finally, Mr. W contends that the ALJ improperly used Dr. Austin's treatment records to diminish his hand limitations when the focus of Dr. Austin's exams was not on Mr. W's hand function. [DE 26 at 12]. First, Mr. W contends that the ALJ failed to acknowledge that Mr. W's two visits with Dr. Austin's s book-ended a major surgery — his right-hand hand tendon-repair on January 30, 2019. However, as noted above, the ALJ's decision discusses this surgery prior to citing findings from Dr. Austin's physical exams the second time. [*See* DE 18 at 33, AR 27]. Although Mr. W initially contended that the ALJ should not have to cited to Dr. Austin's findings to diminish his alleged hand limitations, Mr. W next states that the ALJ should have noted Dr. Austin's observation of a wrap on his hand/wrist. Mr. W contends that this omission is further problematic given the ALJ's finding that compression gloves were not medically determinable. Accordingly, Mr. W contends that if the ALJ had appropriately considered Dr. Austin's observation of a wrap, it would have corroborated his hand symptoms and need for compression gloves.

However, Mr. W fails explain how Dr. Austin's observation of a wrap on his hand or wrist correlates to Mr. W's testimony about wearing compression gloves. This argument also fails to address how Dr. Austin's observation of a hand or wrist wrap

shows the need for further limitations than what was provided for in his RFC—
especially considering Mr. W's initial argument that the focus of Dr. Austin's exams
was not hand function.

### b.      The ALJ's Fingering Analysis

Mr. W also challenges the ALJ's RFC analysis regarding his fingering limitations.
Here, the ALJ found that the evidence in the record supported an RFC that included
frequent fingering[7] while repeatedly discussing the symptoms and limitations Mr. W
alleged about his hands. For instance, the ALJ's decision observed that Mr. W reported
left hand pain in early 2018 but explained that "observation included no sensory
impairment," citing assessments from Mr. W's inpatient stay at a hospital in January
2018 as well as January 2018 treatment records from his family medicine practitioner.
[DE 18 at 33, citing Exhibits B1F and B7F]. The ALJ also noted that Mr. W complained of
bilateral hand pain, pain at the base of his right hand with grinding, left hand pain from
wrist to index finger, reduced range of motion, tenderness to palpation, and sharp
burning pain. [*Id.* at 33].  However, citing treatment records from Mr. W's family
medicine practitioner and treatment records from orthopedic visits, the ALJ found that
Mr. W "was observed with no significant distress, he had a normal gait, he had no
weakness in the upper or lower extremities, his deep tendon reflexes were intact, he had
no clonus, and negative Romberg – although he had a diminished vibration test, he had

---

[7] "Fingering" is defined as actions "involv[ing] picking, pinching, or otherwise working primarily with
the fingers." *Evaluating Solely Nonexertional Impairments*,
https://www.ssa.gov/OP_Home/rulings/di/02/SSR85-15-di-02.html. "Frequent" fingering means that
he can use his hands and fingers "'during an 8-work day for a minimum of 2 hours and 40 minutes (1/3
of the time) and up to 5 hours and 20 minutes (2/3 of the time).'" *See* SSR 83-10, 1983 WL 31251, at *6
(Jan. 1, 1983).

no assistive device, no tremor, no abnormal movements, and no atrophy." [DE 18 at 33, TR 27; citing Exhibits B9F and B1F].

The ALJ's decision also reflected that Mr. W had complained of hand numbness that caused him to drop things and that he had decreased finger sensation. The ALJ, however, found that Mr. W's allegations of numbness were also not observed, referencing physical examination notes from neurology visits from June 5, 2018, to July 5, 2018, treatment notes from physical therapy appointments from December 7, 2017, to July 24, 2018, and treatment notes from physical therapy appointments from August 2, 2018, to September 6, 2018. [DE 16 at 27, citing Exhibits B10F, B13F, and B15F]. Moreover, noting Mr. W's reports of constant, burning hand pain and reports that he could not hold onto things, the ALJ found that, along with other symptoms reported, "observation with a number of providers showed objective exams inconsistent with such allegation of limitation. . . . normal range of motion, . . .  no joint pain, and normal strength." [DE 18 at 33]. Here, the ALJ cited to Mr. W's inpatient hospital records from November 2018, Mr. W's office treatment records from Dr. Austin, and office treatment records from a family medicine practitioner dated November 2018 to March 2019. The ALJ also observed that records from 2019 showed that Mr. W had normal range of motion, no joint pain, and that he was able to make a good fist. [*Id.* at 34, 28; citing Exhibits 35F and 25F].

Despite this, Mr. W contends that the ALJ's decision as to his fingering limitations is not supported by substantial evidence because it is "lump[ed]" with other "musculoskeletal limitations" and "fail[s] to grasp fingering a non-exertional

impairment." [DE 26 at 14-15]. As such, Mr. W contends that the ALJ's fingering analysis is vague and not supported by substantial evidence. However, as discussed above, the ALJ repeatedly referenced evidence related to Plaintiff's allegations to hand limitations as part of determining Plaintiff's RFC. The ALJ sufficiently addressed the evidence in the record such that the court can trace her reasoning even if the ALJ's discussion of Mr. W's hands and fingers was part of the ALJ's general discussion of other limitations. In discussing this evidence, the ALJ stated what findings from the evidence were not consistent with the severity of symptoms or limitations stated by Plaintiff to "minimally articulate" her reasoning and to provide the requisite "logical bridge." *See Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012); *see also Denton*, 596 F.3d at 425-26.

Finally, Mr. W bears the burden of providing evidence establishing the degree to which his impairments limit his functional capacity. *See* 20 C.F.R. §§ 404.1512(a), 404.1545(a)(3); *see also Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). Here, Mr. W has not referred the Court to any evidence that would support further fingering limitations than what was discussed by the ALJ or otherwise provided for in his RFC. *See, e.g., Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) ("There is no error when there is no doctor's opinion contained in the record that indicated greater limitations than those found by the ALJ."); *see also Tritch v. Kijakazi*, No. 1:20-CV-00331-SLC, 2021 WL 4438188, at *6 (N.D. Ind. Sept. 28, 2021) (finding that remand was not warranted when an RFC included frequent handling and fingering for claimant with carpal tunnel syndrome, as claimant had not shown medical evidence establishing further limitations).

### c.  The ALJ's Reaching Limitations

Next, Mr. W contends that the ALJ erred regarding his shoulder impairment by concluding that he retained an RFC for frequent reaching. Specifically, Mr. W contends that the ALJ "pick[ed] and cho[se]" evidence contained in treatment records from his orthopedist (Exhibit B9F) that supported an RFC for frequent reaching and ignored evidence that would credit his allegations of shoulder pain and reaching limitations.

Here, the ALJ observed that Mr. W had a rotator cuff repair approximately eleven months before his alleged onset date and that, just prior to Mr. W's alleged onset date, he was seen by an orthopedist for shoulder pain. The ALJ further indicated that this exam showed "positive Hawkin's impingement, positive Neer impingement signs, positive speed test, and positive yergason test." [DE 18 at 33, AR 27, citing Exhibit 9F]. However, the ALJ then notes that "these observations were not consistent throughout the period at issue." [*Id.*]. The ALJ later observed that physical exams showed "no scapular winging, negative speed test, negative Spurling test, no crepitus, negative lift off, negative Obrien test, and negative yergason test" and that, despite Mr. W's allegations of constant, high levels of pain, records demonstrated that Mr. W had full range of motion in all extremities. [DE 18 at 33; AR 27 (citing Exhibit B9F and B1F)].

Mr. W first questions the ALJ's statement that positive findings in his shoulder exams "were not consistent throughout the period at issue," contending that each visit showed some positive signs on exam. [DE 18 at 33]. Specifically, Mr. W contends that exams showed as follows:

> Hawkins impingement sign on the right (but not left) was positive on
> October 19, 207, as was Neer's and Speed's. But so was Yergason's on the
> right. December 2017, Hawkin's and Neer on the right were negative, but
> empty can test on the right is positive. January 2018, Hawkin's, Neer, and
> Empt Can were positive on the right. April 2018, Hawkin's, Neer, and
> Empty Can were again positive on the right. May 2018, test on the right
> were negative – but Hawkin's and Neer were positive on the left. July
> 2018, Hawkins Neer, and Empty Can were positive on the right; as was
> Drop arm.

[DE 26 at 15-16]. As such, Mr. W contends that "some variation, some waxing and

waning" does not mean that findings were inconsistent; instead, Mr. W contends that

the ALJ should have acknowledged that this was due to his regular medications and

injections. [DE 26 at 16]. In support, Mr. W cites to *Bauer v. Astrue*, 532 F.3d 606, 609 (7th

Cir. 2008), wherein the Seventh Circuit observed that "[a] person who has a chronic

disease, whether physical or psychiatric, and is under continuous treatment for it with

heavy drugs, is likely to have better days and worse days."

  However, it was reasonable for the ALJ to state that test results were not

consistent throughout the record, as the evidence—and even Mr. W's discussion of this

evidence—demonstrates that positive findings were not the same for each test on the

left and right shoulder throughout the relevant period. *See Shramek v.* Apfel, 226 F.3d

809, 811 (7th Cir. 2000) (observing that "we give [an ALJ's] opinion a commonsensical

reading rather than nitpicking at it") (quoting Johnson v. Apfel, 189 F.3d 561 (7th

Cir.1999)). Moreover, Mr. W's reference to *Bauer* fails to support his suggestion that this

statement was improper. *Bauer* addressed an ALJ's decision discounting a claimant's

treatment for bipolar disorder, which is known to respond "erratically to treatment."

532 F.3d at 609. Without more to relate *Bauer* to the facts of Mr. W's case, the Court

cannot find that this statement amounted to the ALJ ignoring a line of evidence contrary to her conclusion or otherwise warrants remand.

Next, the ALJ acknowledged that Mr. W's orthopedist recommended physical therapy and that Mr. W had physical therapy "for neck pain, cervical degeneration, [and] nerve root compression." [DE 18 at 33-34; AR 27-28,]. The ALJ then discussed that exams going into 2019 showed that Mr. W had no weakness in his upper or lower extremities, normal range of motion in his upper extremities, no loss of sensation consistently observed, and "provocative maneuvers were generally unremarkable." [Id]. However, Mr. W alleges that the ALJ "plucked out" these recommendations for physical therapy while failing to address other recommendations from his orthopedist that are consistent with Mr. W's allegations concerning his shoulder limitations. Specifically, Mr. W contends that the ALJ failed to mention that recommendations also included "Advance Activity based on pain and swelling" and "weightbear as tolerated." [DE 26 at 16, citing to AR 1244, 1212, 1215-16, 1220, 1224, 1235, 1239, and 1241]. Mr. W contends that these recommendations credit his testimony that even with treatment, he still has trouble with his shoulders—that that lifting and reaching above his right shoulder bothers him; that his right shoulder makes a big popping noise, causing pain; that he needs help retrieving heavy items from kitchen cupboards; that he is unable to hold his hands out in front of him for more than few minutes without trouble to his shoulders; that he has neck pain radiating to his shoulders; and that activities such as doing the dishes can aggravate this pain.

The ALJ need not discuss every piece of evidence presented; rather, she must provide an accurate and logical bridge between the evidence and her conclusion. *Craft*, 539 F.3d at 673. Neither of these recommendations discuss how, or to what degree, Mr. W's shoulders were limited or provide any restrictions. Accordingly, while the ALJ did not specifically address these two recommendations, the Court cannot find that she avoided discussing a line of evidence, especially considering the ALJ's overall discussion of the objective evidence that did not support Mr. W's allegations regarding his shoulder pain and limitations. *See Denton*, 596 F.3d at 426; *see also Terry,* 580 F.3d at 477. Notably, while Mr. W has devoted much of this argument to description of his shoulder pain and concerns, "[a] claimant's assertions of pain, taken alone, are not conclusive of a disability." *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (internal citation omitted).

### d. Whether the ALJ Erred by Finding an RFC for Frequent Fingering, Reaching, Handling, and Feeling

Mr. W also contends that the ALJ erred by failing to broadly include supported limitations regarding reaching, handling, and fingering in Mr. W's RFC, and, as a result, his RFC does not have a logical bridge. Mr. W's first argument contends that the ALJ failed to include limitations concerning his statements about the burning sensation he experienced in the C6 distribution, including pain in the dorsal side of his hand and persistent trigger finger. Mr. W contends that, had this been properly considered, his RFC should have included no more than occasional fingering, feeling, handling, and reaching.

However, the ALJ observed that Mr. W had reported a burning sensation in the back of his hands as part of the ALJ's discussion of Mr. W's osteoarthritis of the right hand, status post ganglion cyst removal, as a nonsevere impairment at Step Two. [*See* DE 18 at 18, AR 2]. As part of this discussion, the ALJ observed that Mr. W was not taking any medication or had any injections or other treatment for this alleged impairment. [*Id.*] The ALJ also discussed Mr. W's allegations of constant burning hand pain as part of his RFC analysis, observing that emergency care was not recommended and that such limitations were not "well correlated by objective exam." [DE 18 at 33, AR 27].

Nonetheless, Mr. W contends that the ALJ failed to adequately discuss records from Mr. W's orthopedic surgeon, Dr. Leffers, regarding this impairment [Exhibit B25F]. In these records, Dr. Leffers states that while he could not explain pain in Mr. W's left hand, he believed it could be related to cervical radiculopathy in Mr. W's right hand. Based on this, Mr. W contends that "[i]t defies logic that someone with [Mr. W's] cervical radiculopathy . . . could continue using their neck/shoulders/arms/hands/wrists/upper extremities frequently . . . ." [DE 26 at 21]. Mr. W also points out that Dr. Leffers approved a cervical steroid injection with the opinion that it would help with this diagnosis.

However, these records are not as telling as Mr. W contends. While this record does reflect that Dr. Leffers believed Mr. W's left-hand pain may have been caused by cervical radiculopathy in his right hand, such a finding is not, on its own, sufficient to show further limitation. *See Melanie W., 2020 WL 3056309* at *4. These records also fail to

27

demonstrate any further limitations.  Review of Dr. Leffers' treatment records shows observation that Mr. W's right hand had "[f]ull extension of all digits and full composite fist." [DE 18 at 2222, AR 2216].  Moreover, Dr. Leffers also observed that Mr. W had "full extension of all digits and full composite fist. . . . From a functional standpoint the hand works great." [AR 2206]. Without more, the Court cannot find that the ALJ avoided an entire line of evidence contrary to his findings by failing to discuss Dr. Leffers' treatment records or that information from these treatment records would change the ALJ's RFC assessment. *See Denton*, 596 F.3d at 426; *see also* Punzio, 630 F.3d at 712 (stating that "[t]he claimant bears the burden of submitting medical evidence establishing [his] impairments and [his] residual functional capacity.")

Next, Mr. W cites to *Hoskins v. Berryhill*, No. 1:18cv23, 2018 WL 5262939 (N.D. Ind. Oct. 23, 2018) to support remand in his case. In *Hoskins*, the ALJ found that the claimant had numerous severe impairments, including bilateral hand numbness with some paresthesia most consistent with carpal tunnel syndrome and neuropathy of the bilateral upper extremities. *Id.* at *2. Despite these impairments, the ALJ found that the plaintiff retained an RFC that permitted "frequent handling and fingering." *Id.* at *2, *4. The plaintiff in *Hoskins* argued that, based on the evidence in the record, the ALJ's RFC did not satisfy the logical bridge requirement. *Id.* The court in *Hoskins* agreed, finding that the evidence showed that the claimant clearly had problems with handling and fingering and that substantial evidence did not support the ALJ's RFC in light of these conditions. *Id.* Moreover, the court in *Hoskins* observed that the ALJ had relied on "post-dated opinions of the State Agency Consultants," which did not address other medical

28

opinions finding that the plaintiff was more limited than discussed by the State Agency Consultants. *Id.* at *4. Accordingly, *Hoskins* also found that "it is unclear why [the State Agency Consultants'] opinions were given any weight" and remanded the case. *Id.*

However, the facts in *Hoskins* are distinguishable from this matter. Here, Mr. W's upper extremity diagnoses were not as severe, as the ALJ found no severe impairments concerning the use of Mr. W's hands. Perhaps most importantly, unlike the claimant in *Hoskins*, Mr. W has not argued that there is "evidence of a material change in [his] condition that the ALJ did not account for." *Ruth C. v. Saul, No. 1:20-CV-30, 2021 WL 707861, at *6 (N.D. Ind. Feb. 2, 2021)*, *report and recommendation adopted sub nom. Curtis v. Saul*, No. 1:20-CV-30 RLM, 2021 WL 698477 (N.D. Ind. Feb. 23, 2021) (distinguishing *Hoskins*). Based on this, the Court cannot find Mr. W's reference to *Hoskins* supports remand here.

### e. The ALJ's Consideration of Mr. W's Daily Activities

Finally, Mr. W also contends that the ALJ erred by failing to consider his limitations in multiple relevant daily activities and by overemphasizing Mr. W's ability to ride a bike. It is true that critical differences exist between performing activities of daily living and working a full-time job. For instance, when performing activities of daily living, individuals have more flexibility and can secure assistance from others to complete their intended tasks unlike when they work full-time and must meet a minimum standard of performance. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). As a result, courts have cautioned against an exaggerated reliance on the ability to perform daily activities but still finds information about daily activities relevant in

evaluating conflicting evidence about a claimant's limitations. *Chambers v. Saul*, 861 F. App'x 95, 101 (7th Cir. 2021) (citing *Bjornson*, 671 F.3d at 647 (collecting cases)).

Mr. W first contends that the ALJ failed to address several of his daily activities as well as his alleged limitations with those activities. However, the ALJ's decision acknowledges that both Mr. W and his fiancé reported that Mr. W has "pain, gets help to care for his son, has difficulty with self-care, . . . and his impairment affect his ability to squat, lift, bend, reach, sit, kneel, talk, hear, climb stairs . . use his hands . . . ." [DE 18 at 32; AR 26]. However, the ALJ repeatedly discussed the objective medical evidence in the record to support her conclusion that "the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by claimant." [DE 18 at 32; AR 26].

Next, Mr. W contends that the ALJ overemphasized his ability to ride a bike. The ALJ's decision mentions that Mr. W was riding a bike in one instance by noting that a medical provider "observed [Mr. W] to be riding a bicycle" the month after he underwent a left knee partial medial meniscectomy and chondroplasty. [DE 18 at 34; AR 28, citing to Exhibit B33F, AR 3144]. The ALJ mentioned this observation along with reference to observations from other providers that Mr. W was in no apparent distress, had a normal gait, normal range of motion, and normal strength. [*See* DE 18 at 33-34; AR 28]. Mr. W, however, contends that this reference amounted to the ALJ "overemphasiz[ing] bike riding as if [Mr. W] can still do it, as if he can do it without problems, as if aha, he was reported riding a bike so he must not be disabled." [DE 26 at 18].

30

However, the Court cannot find that Mr. W's characterization is accurate here. Namely, the Court cannot find that the ALJ mentioning one provider's observation that Mr. W rode a bike to an appointment amounted to the ALJ overly relying on this activity in the subjective symptom analysis. Instead, the ALJ's decision merely includes that this observation had been made by one of Mr. W's medical providers as part of the ALJ's general discussion of other objective medical evidence. Given the whole of the opinion, the Court cannot find that there was any exaggerated reliance on this observation or that the ALJ equated this observation with an ability to work full-time. As such, the Court cannot find that the ALJ's consideration of Mr. W's daily activities requires remand.

## IV.   CONCLUSION

For the reasons stated above, the ALJ's decision is supported by substantial evidence and is therefore **AFFIRMED**.

**SO ORDERED** this 16th day of March 2023.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge

31